Christopher W. Hellmich (SBN 224169)
**Hellmich Law Group, P.C.**
2967 Michelson Dr.
Bldg. G, Suite #491
Irvine, CA 92612
Phone: (949) 287-5708
Fax: (714) 974-7733

*Attorneys for: Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DISTRICT

| | |
|---|---|
| LES KLINGERMAN, an Individual;<br>CATHI KLINGERMAN, an Individual;<br>KENNIE ARRIOLA an Individual;<br>HERMAN KINSCHER, an Individual;<br>BRIAN TAUS, an Individual;<br>CRAIG INABA, an Individual;<br>GREG HALPRIN, an Individual;<br>LIN LI, an Individual;<br>HANJIANG ZHANG, an Individual;<br>BEN LI, an Individual;<br>JESSIE TAN LI, an Individual;<br>ANDREW NGUYEN, an Individual;<br>SILVIO BRIGLIADORO, an Individual;<br>DAVID GOLDBERG, an Individual;<br>DESIREE YOUNG, an Individual;<br>IRINA MINKOVA, an Individual;<br>MIKHAIL MINKOV, an Individual;<br>MINKOV FAMILY LIVING TRUST;<br>MARIA R. PENUNURI, an Individual;<br>GEORGE HEYWOOD, an Individual;<br>DENISE TAYLOR, an Individual;<br>HAGOP KARAHAGOPIAN, an Individual;<br>GOHAR KARAHAGOPIAN, an Individual;<br>GUY MAROM, EXECUTOR FOR THE<br>ESTATE OF TAL HERZBERG, an<br>Individual;<br>STANLEY SALAH, an Individual;<br>JOSEPH AMELIO, an Individual;<br>TAWNY AMELIO, an Individual;<br>MICHAEL LOEFFLER, an Individual; | CASE NO. _____<br><br><br>COMPLAINT<br><br>(1) CONSTRUCTIVE FRAUD<br>(2) FRAUD<br>(3) CIVIL RICO<br>(4) TEXAS DECEPTIVE TRADE<br>    PRACTICES ACT<br>(5) UNFAIR COMPETITION LAW |

**COMPLAINT**

SIMON PARROTT, an Individual;
MICHAEL TRUSTEY, an Individual;
KEVIN TRUSTEY, an Individual;
PATRICIA TRUSTEY, an Individual; and
DAVID TRUSTEY, an Individual;

*Plaintiffs*

    vs.

THE LAW OFFICES OF ERNESTO
MARTINEZ, JR., PLLC, a Texas
Corporation; ERNESTO MARTINEZ,
JR., an Individual; TERESA QUEZADA,
an Individual; RICK RODRIGUEZ, an
Individual; and DOES 1-10.

*Defendants*.

---

COME NOW PLAINTIFFS, by and through their attorney of record, and for their claims

assert in this Complaint the following:

## I.    PRELIMINARY STATEMENT

1.      Between 2005 and 2007 Plaintiffs invested in certain real estate to be developed in

San Antonio, Texas. Most of the Plaintiffs associated with at least one other Plaintiff in making their

investment. It was later learned the real estate developer was perpetrating a massive fraud and was

unable to complete the developments in which Plaintiffs invested. The U.S. Attorney for the Western

District of Texas secured a criminal conviction against the developer. Plaintiffs then sought to recover

their investment by bringing a lawsuit in Texas state court. Plaintiffs all retained the Law Offices of

Ernesto Martinez, Jr., PLLC ("Martinez Firm") who brought suit in 2009 in Bexar County, Texas.

2.      By 2011 many of the Plaintiffs began questioning attorney Ernesto Martinez, Jr.

("Martinez") about the manner in which he was billing Plaintiffs for the work. Martinez repeatedly

promised he would provide a complete audit but then never did. By 2014 Plaintiffs began comparing

their invoices and estimated that over the course of the case Martinez charged the Plaintiffs approximately $850,000. Plaintiffs' informal self-audit began to reveal the invoices were riddled with errors or irregularities. For example, Martinez repeatedly billed more than 37.5 hours in one day. Plaintiff's paralegal also repeatedly billed in excess of 20 hours in one day. Martinez charged the Plaintiffs approximately $150,000 to pay contract lawyers, but the Martinez Firm's engagement letter states the Martinez Firm is to pay those costs not Plaintiffs.

3.    For at least three Plaintiff groups the Martinez Firm was disqualified from the state case, but Martinez continued to provide them legal services, included them in group correspondences, and even continued to bill them while receiving payments from these Plaintiffs whom he was prohibited from representing. Without consulting with any of those Plaintiffs Martinez assigned his engagement to Rick Rodriguez, an attorney whom none of the Plaintiffs ever met or communicated with. Yet, the Martinez Firm continued to bill these Plaintiffs for work that Rodriguez and Martinez performed on the case. No contract for legal services exists between Rodriguez and any Plaintiff.

4.    In late January 2014, Martinez advised that in order to prepare for a long awaited mediation each Plaintiff group would need to pre-pay $5,050 to prepare individualized "Mediation Binders" that would analyze the strength of the case, contain expert reports, and provide a damages analysis for each Plaintiff. The fee also included prepaying for experts to travel and participate in the mediation, the mediator's fees, as well as fees to pay the Martinez Firm to attend the mediation. Plaintiffs paid the Martinez Firm nearly $90,000 for the creation of the Mediation Binders. When the mediation was canceled just days before it was to start Plaintiffs demanded to review their Mediation Binders. Martinez refused to produce any of the alleged Mediation Binders and Plaintiffs now reasonably believe they were never created.

5.      On November 29, 2014, Plaintiffs commenced an arbitration action against the Martinez Firm and Martinez in Texas. The Martinez Firm has steadfastly refused to produce any documents. Plaintiffs are unable to verify or substantiate any of the invoices or blatantly fraudulent charges. By way of this action Plaintiffs seek to hold all persons liable for the fraud including non-parties to the arbitration. Finally, it is reasonably believed that the Martinez Firm and Martinez will default on the arbitration by refusing to pay the arbitrator's fees. In the event that occurs, this action will be the only means Plaintiff have to seek redress from all culpable parties.

II.    **PARTIES**

6.      Plaintiff LES KLINGERMAN, an individual, resides in Orange County, California.

7.      Plaintiff CATHI KLINGERMAN, an individual, resides in Orange County, California. The Klingermans together formed an investment group for the business purpose of investing in real estate.

8.      Plaintiff KENNIE ARRIOLA, an individual, resides in Orange County, California.

9.      Plaintiff HERMAN KINSCHER, an individual, resides in Orange County, California.

10.     Plaintiff BRIAN TAUS, an individual, resides in Orange County, California.

11.     Plaintiff CRAIG INABA, an individual, resides in Orange County, California. Arriola, Kinscher, Taus and Inaba together formed an investment group for the business purpose of investing in real estate.

12.     Plaintiff GREG HALPRIN, an individual, resides in Orange County, California. Halprin operated an investment portfolio for the business purpose of investing in real estate.

13.     Plaintiff LIN LI, an individual, resides in Orange County, California.

14.     Plaintiff HANJIANG ZHANG, an individual, resides in Orange County, California. Zhang and Lin Li together formed an investment group for the business purpose of investing in real estate.

15.     Plaintiff BEN LI, an individual, resides in Orange County, California.

16.     Plaintiff JESSIE TAN LI, an individual, resides in Orange County, California. Ben Li and Jessie Tan G. Li together formed an investment group for the business purpose of investing in real estate.

17.     Plaintiff ANDREW NGUYEN, an individual, resides in Riverside County, California. Nguyen operated an investment portfolio for the business purpose of investing in real estate.

18.     Plaintiff SILVIO BRIGLIADORO, an individual, resides in Riverside, California. Brigliadoro operated an investment portfolio for the business purpose of investing in real estate.

19.     Plaintiff DAVID GOLDBERG, an individual, resides in Los Angeles County, California. Goldberg operated an investment portfolio for the business purpose of investing in real estate.

20.     Plaintiff DESIREE YOUNG, an individual, resides in Los Angeles County, California. Young operated an investment portfolio for the business purpose of investing in real estate.

21.     Plaintiff IRINA MINKOVA, an individual, resides in Los Angeles County, California.

22.     Plaintiff MIKHAIL MINKOV, an individual resides in Los Angeles County, California.

23.     Plaintiff THE MINKOV FAMILY LIVING TRUST, a California trust is owned and together managed by the Minkovs who operated the Trust for the business purpose of investing in

real estate.

24.     Plaintiff MARIA R. PENUNURI, an individual, resides in Los Angeles County, California. Penunuri operated an investment portfolio for the business purpose of investing in real estate.

25.     Plaintiff GEORGE HEYWOOD, an individual, resides in Los Angeles County, California.

26.     Plaintiff DENISE TAYLOR, an individual, resides in Los Angeles County, California. Heywood and Taylor together formed an investment group for the business purpose of investing in real estate.

27.     Plaintiff HAGOP KARAHAGOPIAN, an individual, resides in Los Angeles County, California.

28.     Plaintiff GOHAR KARAHAGOPIAN, an individual, resides in resides in Los Angeles County, California. The Karahagopians together formed an investment group for the business purpose of investing in real estate.

29.     Plaintiff GUY MAROM, EXECUTOR FOR THE ESTATE OF TAL HERZBERG, an individual, resides in Los Angeles, California. Herzberg operated an investment portfolio for the business purpose of investing in real estate.

30.     Plaintiff STANLEY SALAH, an individual, resides in San Jose, California. Salah operated an investment portfolio for the business purpose of investing in real estate.

31.     Plaintiff JOSEPH AMELIO, an individual, resides in Santa Clara County, California.

32.     Plaintiff TAWNY AMELIO, an individual, resides in Santa Clara County, California.

**COMPLAINT**

The Amelios together formed an investment group for the business purpose of investing in real estate.

33.     Plaintiff MICHAEL DEAN LOEFFLER, an individual, resides in Santa Clara County, California. Loeffler operated an investment portfolio for the business purpose of investing in real estate.

34.     Plaintiff SIMON PARROTT, an individual, resides in Reno, Nevada. Parrott operated an investment portfolio for the business purpose of investing in real estate.

35.     Plaintiff MICHAEL TRUSTEY, an individual, resides in Queens, New York.

36.     Plaintiff KEVIN TRUSTEY, an individual, resides in Nassau County, New York.

37.     Plaintiff PATRICIA TRUSTEY, an individual, resides in Nassau County, New York.

38.     Plaintiff DAVID TRUSTEY, an individual, resides in Nassau County, New York. The Trusteys together formed an investment group for the business purpose of investing in real estate.

39.     Upon information and belief, Defendant LAW OFFICES OF ERNESTO MARTINEZ, JR., PLLC is a Texas corporation in good standing with the Texas Secretary of State ("Law Firm"). The Martinez Firm operates from offices in San Antonio, Texas. Upon information and belief the sole owner of the Martinez Firm is Defendant ERNESTO MARTINEZ, JR.

40.     Upon information and belief, Defendant ERNESTO MARTINEZ, JR. is a Texas licensed attorney and resides in Bexar County, Texas and is the sole owner of the Martinez Firm ("Martinez"). Martinez provided legal services to Plaintiffs.

41.     Upon information and belief, Defendant RICK RODRIGUEZ is a Texas licensed attorney and resides in Bexar County, Texas ("Rodriguez"). The Martinez Firm allegedly employed Rodriguez in some manner to provide legal services to Plaintiffs.

42.     Upon information and belief, Defendant TERESA QUEZADA resides in Bexar County, Texas ("Quezada"). The Martinez Firm employed Quezada as a paralegal and/or office manager. In her role, Quezada provided legal services to Plaintiffs.

43.     Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

44.     Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned each of the Defendants sued herein was the agent and employee of each of the remaining Defendants. Plaintiffs allege that each and every Defendant alleged herein ratified the conduct of each and every other Defendant. Plaintiffs further allege that at all times said Defendants were acting within the purpose and scope of such agency and employment.

## III.    JURISDICTION AND VENUE

45.     This Court has jurisdiction over Plaintiffs' claims for relief pursuant to 28 U.S.C. § 1332 (a)(1) in that there is diversity among the Parties and the dispute is greater than $75,000.

46.     Venue in this judicial district is appropriate pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this district. Separately, venue is also found pursuant to 28 U.S.C. §1391(b)(3) in that all Defendants are subject to the court's personal jurisdiction.

47.     Personal jurisdiction is proper over Defendants in that they intentionally and repeatedly entered this district to conduct business with Plaintiffs and entered contracts with Plaintiffs in this District, which are the basis for this lawsuit.

IV.    **FACTS COMMON TO ALL COUNTS**

48.    From approximately 2006 through 2008 the Plaintiffs invested in one or more real estate developments in the San Antonio area. It was later discovered the developer was severely under capitalized and was using the developments as a means of scamming people like the Plaintiffs. The developments failed to materialize and Plaintiffs all lost the properties they purchased. The local US Attorney successfully prosecuted the developer. However, the Plaintiffs all believed that others were similarly culpable for their losses.

49.    Martinez held himself out as a seasoned lawyer who could capably represent the Plaintiffs. In fact, though, he had only been out of law school for a few years and was not qualified to handle this complex mix banking, insurance, and real estate laws. These facts were unknown to the Plaintiffs and they all eventually relied on Martinez's representations and engaged the Martinez Firm. Aside from the aforementioned Plaintiff investment groups few, if any, of the Plaintiffs knew one another prior to retaining the Martinez Firm.

50.    As the Martinez Firm was beginning to sign-up more and more Plaintiffs Martinez decided he could entice more people to hire the Martinez Firm by offering to allow Plaintiffs to share the costs of the litigation among all of his clients. In so doing, Martinez told the first approximately nine Plaintiffs to retain the Martinez Firm that they would jointly share the costs of the litigation and that he lowered his hourly rate to $200 plus typically a contingency fee. In this way, each of the Plaintiffs with an engagement letter specifying a $200 hourly rate would equally divide one hour of Martinez's time at $200/hr and would similarly pay their pro rata share of expenses. Shortly after Martinez filed the initial Complaint Martinez then added another group of nearly 20 Plaintiffs. This second group of Plaintiffs' hourly rate was only $150/hr with varying contingencies. The result was

that there were two groups of Plaintiffs paying different hourly fees for the same work. Martinez made it clear that he was not double billing, *i.e.*, incurring an hour's worth of work and billing the $150/hr group for that full hour and also billing the $200/hr group for the same one hour of work. Of course, it is now known that is exactly what he and his staff frequently did. Martinez refused to disclose which Plaintiffs were in each group or the number of Plaintiffs in each group. Martinez concealed this information from Plaintiffs as a means of hiding Defendants' fraud. This concealment also fostered the object of the RICO Enterprise. *See, infra* ¶¶66-72.

51.     The Martinez Firm's engagement letter acknowledges the residency and/or business address of each of the Plaintiffs. Each Defendant clearly knew that they were representing no fewer than 23 people or businesses in this judicial district, 33 total in California, and an additional five other Plaintiffs throughout the country. Plainly, each Defendant repeatedly and intentionally entered this judicial district for the purpose of engaging in interstate commerce with Plaintiffs.

52.     In 2009 the Martinez Firm filed a lawsuit on behalf of the Plaintiffs in Texas state court. Among the defendants was an FDIC insured bank. In 2013, the FDIC seized the bank and removed the lawsuit to United States District Court for the Western District of Texas – San Antonio Division where it is currently pending. That lawsuit is styled *Halprin et al., v. FDIC, et al.*, 5:13-CV-1042- RP ("FDIC Litigation").

53.     Defendants' standard means of communicating with Plaintiffs was via the US post and US wires. Hundreds of such interstate communications occurred over the course of Defendants' engagement with the Plaintiffs, but only a select number are highlighted here to establish the jurisdictional required predicate acts. Over the nearly six years Defendants represented Plaintiffs the Martinez Firm issued a total of 23 invoices to the Plaintiffs. As described below, virtually each and

every invoice was false in that they included fees and costs not incurred or not agreed to by the Plaintiffs.

54.     In approximately 2011 some of the Plaintiffs began to question the manner in which the Martinez Firm was calculating and dividing the invoices among the Plaintiffs. Both Martinez and Quezada routinely deflected these questions and refused to provide any substantive information. Martinez began promising to provide a full accounting, but he never did. The promises were designed to stall the Plaintiffs from being more insistent and in that regard those false promises achieved their fraudulent purpose.

55.     The most stunning instance of Martinez's misconduct occurred in January 2014. Martinez told the Plaintiffs in a group email that as the parties in the FDIC Litigation were preparing to mediate the dispute in March 2014 he said he needed to create an individualized "Mediation Binder" for each Plaintiff. Martinez explained the Mediation Binder would explore the strengths of the case, contain a damages analysis, expert reports, and was to advocate their litigation position to the mediator and to defendants. The costs were to include personal consultation between Martinez and each Plaintiff and Martinez said the creation of each Mediation Binder would require his team to spend eight hours to complete each Mediation Binder. In all, Martinez budgeted and billed for 400 hours of attorney time between February 1, 2014 and March 25, 2014 when the mediation was to occur. Days before the mediation Martinez told the Plaintiffs that he was completely prepared for the mediation leading Plaintiffs to believe all of the Mediation Binders were completed.

56.     Martinez demanded each Plaintiff pre-pay the Martinez Firm $5,050 for the creation of the Plaintiff's Mediation Binder. Approximately $101,000 was needed to finance Martinez, Rodriguez, Quezada, and the Martinez Firm to prepare for the long anticipated mediation. Most

Plaintiffs fully paid the $5,050, but the mediation was canceled just five days before it was to begin. Approximately, 85% of the money Martinez required was in fact paid to the Martinez Firm. Of course, the Plaintiffs demanded Martinez share with them the Mediation Binders they paid for, along with the Martinez Firm's time sheets to create the Mediation Binders, but Martinez refuses to produce them.

57.    In the FDIC Litigation first Judge Garcia, and then Judge Pittman, had to order Defendants to turn over to substitute counsel the Plaintiffs' files because Defendants refused to do so voluntarily. *See*, FDIC Litigation, Dkt. Nos. 26 and 64. Notably, Defendants did not produce the Mediation Binders. The Martinez Firm and Martinez also refused to produce the Mediation Binders in the ongoing arbitration. *See, infra* ¶65. It appears most Plaintiffs paid $5,050 for Mediation Binders that were never created.

58.    In May 2014 the Klingermans retained the undersigned counsel, Hellmich Law Group, PC ("HLG"), to provide them with a second opinion regarding the FDIC Litigation. Klingermans and HLG advised Martinez of his mandate and initially Martinez cooperated with HLG's review, but quickly stopped providing the most essential documents. During HLG's review it instantly became apparent there were innumerable billing irregularities. The Klingerman's then expanded HLG's mandate and retained HLG to investigate the accounting irregularities and, if necessary, bring an arbitration action against the Martinez Firm and Martinez ("Overcharge Arbitration").

59.    HLG's investigation revealed the following: Defendants charged the Plaintiffs approximately $850,000 during the entire course of their representation and the invoices were riddled with irregularities. Just some of the irregularities included, Martinez repeatedly billed more than 37.5 hours in one day. Quezada also repeatedly billed in excess of 20 hours in one day. The Martinez Firm

charged the Plaintiffs approximately $150,000 to pay contract lawyers, most notably, Rodriguez. However, the Martinez Firm's engagement letter states the Martinez Firm is to pay those fees not the Plaintiffs. Plaintiffs pre-paid the Martinez Firm to retain experts to support the FDIC Litigation, but Martinez refused to actually use the money to pay the experts. Many of the Plaintiffs demanded the return of these pre-paid funds, but Martinez refused and the Martinez Firm still holds them today. Defendants refuse to state how much of Plaintiffs money they still hold.  Martinez said that he retained and paid one such expert $2,000, but when HLG contacted the expert he provided an affidavit confirming Plaintiff never retained him or paid him any money.

60.    HLG further discovered that in August 2013, the Texas state court disqualified the Martinez Firm and Martinez from representing Plaintiffs Lin Li, Hanjiang Zhang, Ben Li, Jessie Tan G. LI, Joseph Amelio, Tawny Amelio, and Edward Arriola. Martinez told these Plaintiffs not to worry about his disqualification and that he would resolve the situation. The solution was Martinez and the Martinez Firm conspired with Rodriguez to have Rodriguez take over the representation without ever securing the consent of the effected Plaintiffs. Rodriguez appeared in the FDIC Litigation on behalf of these Plaintiffs, but Rodriguez never communicated with any of these Plaintiffs to secure, let alone execute a formal retainer agreement with their approval of him representing them. Martinez and the Martinez Firm, though, continued to bill these Plaintiffs as if no disqualification had occurred. Martinez continued to bill these Plaintiffs for his time in the FDIC Litigation. These Plaintiffs were completely unaware that their disclosed lawyer was Rodriguez and were never advised as to who was representing them.

61.    In response to Judge Pittman's March 25, 2015 order (see, FDIC Litigation, Dkt. #64) compelling the Martinez Firm to turn over Plaintiffs' files to substitute counsel the Martinez Firm announced it has no written contract with Rodriguez or any associated in the FDIC Litigation. The

absence of such a rudimentary contract between lawyers representing the many of the same people in

the same matter underscores the deceptive nature of the relationship among these Defendants.

62.    In the summer of 2014, Plaintiffs all retained HLG to investigate the Martinez Firm's

billing irregularities and, if necessary, bring an arbitration action against the Martinez Firm and

Martinez. HLG wrote to the Martinez Firm and demanded that it provide certain documents related to

the underlying fees and costs included in the Martinez Firm's invoices, but the Martinez Firm refused

to produce any documents. HLG also demanded the Martinez Firm return to the Plaintiffs the money

they pre-paid for experts, but that Martinez refused to actually use to pay those experts. Again,

Defendants Martinez and the Martinez Firm refused.

63.    HLG attempted several methods of trying to amicably resolve the dispute but they

were fruitless. On October 17, 2014, on behalf of the Plaintiffs, HLG issued a letter terminating for

cause Martinez and the Martinez Firm. Further, HLG instructed the Martinez Firm and Martinez to

immediately withdraw from all representations in all matters. The Martinez Firm and Martinez

refused and never filed a single notice of withdrawal in the FDIC Litigation or in any companion

case. On November 29, 2014 HLG served on the Martinez Firm and Martinez a notice of demand to

arbitrate before Conflict Solutions of Texas ("CST").

64.    In response to being terminated Martinez sent approximate 15 individual letters to each

defendant in the FDIC Litigation confirming that a particular Plaintiff had terminated the Martinez

Firm. Each letter claimed that the Plaintiff allegedly owed the Martinez Firm a sum certain, which

was listed, and that the Plaintiff had a contingency fee agreement with the Martinez Firm. Martinez

then revealed the confidential contingency fee in the letter. Martinez then bizarrely claimed that the

defendants in the FDIC Litigation were obligated to ensure that any monies they paid to the identified

Plaintiffs must be made payable jointly to the Martinez Firm. The wrongful disclosure of Plaintiffs' confidential payment terms injured the Plaintiffs' position in the FDIC Litigation because it provided substantive information that defendants will undoubtedly use when calculating settlement offers.

65.    In the arbitration Plaintiffs propounded document requests upon the Martinez Firm and Martinez. The category of documents sought included, *e.g.*, receipts for each incurred expense charged to Plaintiffs, contracts between the Martinez Firm and contract attorneys (including Rodriguez), the Mediation Binders, IOLTA trust account records, contracts and payments to experts, confirmation the Martinez Firm withdrew from pending matters, confirmation of the fees the Martinez Firm agreed to pay contract attorney and the amount actually paid, and other similar rudimentary documents a law firm is obligated to retain and promptly produce to a requesting client. Martinez and the Martinez Firm refused to produce one single page of responsive documents.

66.    The RICO Enterprise consists of the Martinez Firm, Martinez, Rodriguez, Quezada, and Does 1-10. The Martinez Firm, Martinez, Rodriguez, Quezada, and Does 1-10, associated together to form a RICO Enterprise within the meaning of 18 U.S.C. §1961(4). The purpose of their racketeering activity was to defraud the Plaintiffs of their money with the knowledge that their actions would directly damage Plaintiff's investment business in real estate.

67.    The pattern of racketeering activity was committed by a series of predicate acts in violation of 18 U.S.C. §1962(c) as a means of defrauding Plaintiffs. The RICO Enterprise continually operated for several years concealing its nature and purpose and effecting the purpose of the racketeering activity, including the use of a fraudulent emailing and mailing invoices the Defendants knew contained false, inflated, improper, or unsupported fees and costs.

68.    Martinez was the undisputed leader of the RCIO Enterprise. Martinez, and in turn, each

member of the RICO Enterprise knew that Martinez's intentionally fraudulent billing practices would enrich each of them and the RICO Enterprise.

69.     In support of the RICO Enterprise Rodriguez improperly assumed the representation of several Plaintiffs in ongoing litigation without their consent or knowledge (*supra* ¶¶XX). Rodriguez knew he was obligated to secure the consent of these Plaintiffs before appearing in both state and federal courts on their behalf, but he did not. Martinez, Rodriguez, and the Martinez Firm knew that it was absolutely improper for Rodriguez to represent these Plaintiffs without their explicit consent and approval. Martinez, Rodriguez, and the Martinez Firm conspired together to conceal this requirement from these Plaintiffs and, in fact, never sought their approval for Rodriguez to represent them before any court. Despite this, Rodriguez, on information and belief, submitted invoices of some type to the Martinez Firm for payment for his alleged legal services. As part of the conspiracy to defraud, the Martinez Firm passed on Rodriguez's alleged fees to the Plaintiffs through the Martinez Firm's standard billing system. Further, Rodriguez, Martinez and the Martinez Firm conspired to conceal their illegal scheme by intentionally not documenting any formal relationship between the Martinez Firm's engagement on the FDIC Litigation and Rodriguez's role as a contract attorney to the Martinez Firm.

70.     Rodriguez's role in the RICO Enterprise went beyond the fraudulent representation of Plaintiffs in the FDIC Litigation. Rodriguez also knew or should have known that his work being billed to all of the Plaintiffs represented fees that were to be paid by the Martinez Firm and not Plaintiffs. Therefore, Rodriguez knew that each invoice he submitted to the Martinez Firm, which he knew was in turn processed by Quezada and forwarded to Plaintiffs for payment, was improper. The absence of any written contract between Rodriguez and the Martinez Firm underscores Rodriguez's impropriety.

71.     For her part, Quezada, a paralegal, was responsible for compiling and distributing the improper invoices via the US post office and using US wires. Quezada knew that she was double billing her time, that Martinez was double billing his time, that the invoices had no support or justification and yet she willingly participated in the scheme and was the person to actually tender the fraudulent invoices to Plaintiffs. Moreover, Plaintiffs directly challenged, questioned, and complained to Martinez and Quezada the billing irregularities putting them on notice of the problem. In the event the irregularities were honest mistakes Plaintiffs gave Defendants the opportunity to correct the invoices. Instead, Defendants insisted they reviewed Plaintiffs' complaints and determined the Martinez Firm's invoices were correct. In so doing, Defendants confirmed their intent to defraud.

72.     The following invoices sent interstate via the US post office and US wires satisfies the Civil RICO predicate acts requirement.

    a.     Invoice #100 sent on or about June, 8, 2009 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

    b.     Statement #100 explanation and correction on or about June 8, 2009 invoice sent via email by Ernesto Martinez in violation of 18 U.S.C. §1343;

    c.     Statement #100 sent on or about April 13, 2009 via email by Ernesto Martinez in violation of 18 U.S.C. §1343;

    d.     Invoice #114 sent on or about July 28, 2009 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

    e.     Invoice #125 sent on or about September 4, 2009 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

**COMPLAINT**

f.   Invoice #165 sent on or about October 7, 2009 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

g.   Invoice #211 sent on or about November 13, 2009 by US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

h.   Invoice #230 sent on or about December 16, 2009 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

i.   Invoice #286 sent on or about January 29, 2010 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

j.   Upon information and belief, invoice sent on or about April 16, 2010 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

k.   Upon information and belief, invoice sent on or about April 28, 2010 via US Mail and email by Quezada in violation of 18 U.S.C. §1341 and §1343, respectively;

l.   Invoice #467 sent on or about June 9, 2010 via email by Quezada in violation of 18 U.S.C. §1343;

m.   Invoice #618 sent on or about August 9, 2010 via email by Quezada in violation of 18 U.S.C. §1343;

n.   Invoice #770 sent on or about October 27, 2010 via email by Quezada in violation of 18 U.S.C. §1343;

o.   Invoice #780 sent on or about November 23, 2010 via email by Quezada in violation of 18 U.S.C. §1343;

**COMPLAINT**

p.  Invoice #919 sent on or about January 19, 2011 via email by Quezada in violation of 18 U.S.C. §1343;

q.  Invoice #955 sent on or about March 14, 2011 via email by Quezada in violation of 18 U.S.C. §1343;

r.  Invoice #3040 sent on or about November 16, 2011 via email by Quezada in violation of 18 U.S.C. §1343;

s.  Invoice #3082 sent on or about May 24, 2012 via email by Quezada in violation of 18 U.S.C. §1343;

t.  Invoice #7021 sent on or about October 2, 2012 via email by Quezada in violation of 18 U.S.C. §1343;

u.  Invoice #33 sent on or about April 25, 2013 via email by Quezada in violation of 18 U.S.C. §1343;

v.  Invoice #10117 sent on or about December 20, 2013 via email by Quezada in violation of 18 U.S.C. §1343;

w.  Invoices #10023 & 10028 sent on or about August 13, 2013 via email by Liz O'Connell in violation of 18 U.S.C. §1343;

x.  Invoice #128 sent on or about August 13, 2013 sent via email by Liz O'Connell in violation of 18 U.S.C. §1343;

y.  Invoice #10153 sent on or about January 17, 2014 via email by Quezada in violation of 18 U.S.C. §1343;

z.   On or about May 14, 2013 'trial expense balance due' letter sent via email by Teresa Quezada in violation of 18 U.S.C. §1343;

aa.   Upon information and belief, invoice sent on or about January 31, 2014 via email by Quezada in violation of 18 U.S.C. §1343;

bb.   On or about April 10, 2014 mediation fees balance letter sent via email by Tonja Zamora in violation of 18 U.S.C. §1343; and

cc.   On or about July 16, 2014 'balance due' letter sent via email by Tonja Zamora in violation of 18 U.S.C. §1343.

73.   In that Martinez and the Martinez Firm refuses to comply with their obligations under TEX. DISCIPLINARY R. PROF. CONDUCT 1.03 ("shall…promptly comply with reasonable requests for information."), 1.04 (shall not charge unconscionable fees. "A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable."), 1.08 (prohibited transactions with clients) and 1.14 (safekeeping and returning clients money) and thereby substantiate the fees and expenses contained in each of these invoices and/or demands for payment they are all presumptively improper and therefore fraudulent.

74.   Defendants used the U.S. Mail and the U.S. Wires in violation of 18 U.S.C. §1341 and §1343, respectively, to communicate the fraudulent invoices to Plaintiffs in furtherance of the illegal object of the racketeering activity. *See*, 18 U.S.C. §1962(c) and (d). Each one of those communications occurred via interstate wires and/or the U.S. Mail in furtherance of the RICO Enterprise's purpose.

**IV.    CAUSES OF ACTION**

## COUNT I

### CONSTRUCTIVE FRAUD (CAL. CIV. C. §1573)

75.    Plaintiffs repeat and re-allege all paragraphs above as if set forth fully herein.

76.    "Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship…[A]s a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another *even though the conduct is not otherwise fraudulent.*" *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 562 (emphasis in original).

77.    "The elements of a cause of action for constructive fraud are (1) a fiduciary relationship; (2) nondisclosure; (3) intent to deceive; and (4) reliance and resulting injury (causation)." *General American Life Ins. Co. v. Rana* (N.D. Cal. 1991) 769 F.Supp. 1121, 1126 citing *Younan v. Equifax Inc.,* (1980) 111 Cal.App.3d 498, 516 n. 14.

78.    Damages stemming from constructive fraud are far broader than mere out-of-pocket costs. *Salahutdin*, 24 Cal.App.4th at 567 ("*the faithless fiduciary shall make good the full amount of the loss of which his breach of faith is a cause.*" (emphasis in original)). In *Salahutdin* the court held that "benefit of the bargain" test awards the plaintiff the loss sustained rather than the value with which he parted. The court found the full measures of injury as provided for in CAL. CIV. CODE §§ 3333 and 1709 are applicable and they certainly include lost and future profits. *Id.*

79.    Defendants all were attorneys or staff working for attorneys representing Plaintiffs in in the ongoing FDIC Litigation and as such each Defendant was in an explicit fiduciary relationship with each Plaintiff.

80.     Defendants have a legal duty to substantiate each transaction with Plaintiffs, provide prompt information in response to requests and safeguard and return Plaintiffs' money. TEX. DISCIPLINARY R. PROF. CONDUCT 1.03, 1.04, 1.08, and 1.14.

81.     The acts, omissions or concealments resulting in injury are listed herein.

82.     Defendants' intent to deceive the Plaintiffs is shown in their concealment of the identities and/or numbers of each Plaintiff in the two billing groups. Separately, Defendants repeatedly defended their billing practices including charging 37.5 hours of work in one day, billing for associated counsel, including Rodriguez, when Defendants knew the Law Firm was to pay those fees. Separately, Defendants continue to conceal the amount of Plaintiffs' money they are holding and refuse to return it.

83.     Defendants' false statements were the direct and proximate cause of Plaintiffs' injuries in that Plaintiffs paid monies that were not due or owing to Defendants or were unconscionable.

84.     Plaintiffs were plainly injured by Defendants actions in an amount to be proven at trial but that is no less than $850,000.

## COUNT II
## FRAUD

### CALIFORNIA CIVIL CODE § 1572 (Actual Fraud – Omission) and/or CALIFORNIA CIVIL CODE § 1710 (Deceit).

85.     Plaintiffs repeat and re-allege all paragraphs above as if set forth fully herein.

86.     The above listed invoices contained statements Defendants made to each Plaintiff alleging the truth or accuracy of the charges contained therein.

87.     Defendants have a legal duty to substantiate each transaction with Plaintiffs, provide

**COMPLAINT**

prompt information in response to requests and safeguard and return Plaintiffs' money. TEX. DISCIPLINARY R. PROF. CONDUCT 1.03, 1.04, 1.08, and 1.14.

88.    Defendants have refused to substantiate any of the charges in all of the invoices and therefore all of the charges and invoices are deemed fraudulent.

89.    Plaintiffs reasonably and actually relied on the invoices and Defendants' demand for payment by actually paying money to Defendants in response to the invoices.

90.    Defendants' false statements were the direct and proximate cause of Plaintiffs' injuries in that Plaintiffs paid monies that were not due or owing to Defendants or were unconscionable.

91.    Plaintiffs were plainly injured by Defendants actions in an amount to be proven at trial but that is no less than $850,000.

### Deceit

92.    "To be actionable deceit, the representation need not be made with knowledge of actual falsity, but need only be an 'assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487-488.  The Supreme Court also specifically held that scienter is not an element to fraud by deceit.

93.    As plead herein, Plaintiffs have established fraud by deceit.

94.    Defendants' false statements were the direct and proximate cause of Plaintiffs' injuries in that Plaintiffs paid monies that were not due or owing to Defendants.

95.    Plaintiffs were plainly injured by Defendants actions in an amount to be proven at trial but that is no less than $850,000.

## COUNT III
## CIVIL RICO 18 U.S.C. §§1961-1968

96.    Plaintiffs repeat and re-allege all paragraphs above as if set forth fully herein.

97.    The injury alleged to Plaintiffs was caused by Defendants' commission of two or more of the predicate acts as defined in 18 U.S.C. §1961(1). Plaintiffs were the intended targets of the Defendants' conduct because Defendants knew Plaintiffs' business in investing in real estate provided sufficient operating capital to fund Defendants unaccounted for and unconscionable charges for services or expenses not actually incurred. As described herein, Plaintiffs' real estate investment businesses and/or property interests in the FDIC Litigation were severely injured by the object and/or conduct of the RICO Enterprise.

98.    Plaintiffs' real estate investment was conducted and achieved by interstate commerce as was Defendants' representation of Plaintiffs. As shown above, the parties repeatedly engaged in interstate communications and transactions as a means of pursuing Plaintiffs' business and property interests in the FDIC Litigation. Defendants' disclosure of attorney-client confidential information to the defendants in the FDIC Litigation and Defendants' refusal to turn over to substitute counsel Plaintiffs' files in the FDIC Litigation demonstrate the RICO Enterprises object to injure Plaintiffs' real estate investment business and/or property interests in the FDIC Litigation

99.    Defendants together comprised a RICO Enterprise whose shared common purpose was to engage in racketeering activity in violation of 18 U.S.C. §1961(1). While each member of the RICO Enterprise took affirmative steps to further support the RICO Enterprise Plaintiff's investigation reveals that Martinez was the primary leader of the RICO Enterprise directing its activities.

100.    All Defendants did acquire and/or maintain, directly or indirectly, an interest in or

control of a RICO Enterprise of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate commerce, all in violation of 18 U.S.C. §§1961(4), (5), (9), and 1962(b).

101.    During the ten calendar years preceding the date of this Complaint all Defendants did cooperate jointly and severally in the commission of two or more of the RICO predicate acts that are itemized in 18 U.S.C. §§1916 (1)(A) and (B), and did so in violation of 18 U.S.C. §1962(b).

102.    Plaintiff further alleges that all Defendants did commit two or more offenses described herein which they calculated and intended to threaten a continuity of the RICO Enterprise, *i.e.* a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. §1962(b). Indeed, the RICO Enterprise continues to the date of this Complaint by means of actively concealing the RICO Enterprise and attempting to injure Plaintiffs' business and/or property interests in the ongoing FDIC Litigation.

103.    Prior to trebling, Plaintiff suffered economic injuries as a direct and proximate result of RICO Enterprise in an amount to be proven at trial but that is no less than $850,000.

## COUNT IV

### TEXAS DECEPTIVE TRADE PRACTICES

104.    Plaintiffs repeat and re-allege all paragraphs above as if set forth fully herein.

105.    Defendants engaged in certain false, misleading and/or deceptive acts, practices and/or omissions actionable under the Texas Deceptive Trade Practices-Consumer Protection Act (TEX. BUS. COMM. CODE § 17.41 *et seq.*).

106.    Defendants engaged in an "unconscionable action or course of action" to the detriment

of Plaintiffs as that term is defined by TEX. BUS. COMM. CODE §17.45(5), by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs with respect to the conduct of FDIC Litigation, to a grossly unfair degree.

107.   Defendants violated TEX. BUS. COMM. CODE §17.46(b), in that Defendants:

a.   caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

b.   caused confusion or misunderstanding as to affiliation, connection or association with, or certification by, another,

c.   represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

d.   represented that goods or services are of a particular standard, quality, or grade;

e.   advertised goods or services with the intention to not sell them as advertised;

f.   represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

g.   misrepresented the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction;

h.   represented that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and

i.   failed to disclose information concerning goods or services which was known at the time of the transaction with the intention of inducing the consumer into a transaction

into which the consumer would not have entered had the information been disclosed.

108.   Defendants breached the following warranties under TEX. BUS. COMM. CODE §17.50(a)(2):

    a.   the implied warranty of fitness for a particular purpose; and

    b.   the implied warranty of good and workman like performance.

109.   Defendants' acts, practices and/or omissions complained of were the direct and proximate cause of Plaintiffs' damages.

110.   Plaintiffs reasonably relied to their detriment on the acts, practices and/or omissions complained of under TEX. BUS. COMM. CODE §17.46(b).

111.   Each Plaintiff sustained economic and actual damages as a result of the actions and/or omissions of Defendants described herein. Defendants' false, misleading and deceptive acts, practices and/or omissions complained of herein were committed "knowingly" in that Defendants had actual awareness of the falsity, deception, or unfairness of such acts, practices, and/or omissions.

112.   Plaintiffs further alleged such acts, practices, and/or omissions were committed "intentionally" in that Defendants specifically intended that Plaintiffs act in detrimental reliance on the falsity or deception or in detrimental "ignorance" of the unfairness. Therefore Plaintiffs are entitled to recover multiple damages as provided by TEX. BUS. COMM. CODE, §17.50(b) (1).

113.   Pursuant to TEX. BUS. COMM. CODE, §17.50(b)(3) Plaintiffs request the Court rescind the transactions on which this complaint is based and enter appropriate orders necessary to restore to Plaintiffs money and/or property acquired in violation of said Act, including but not limited to: an order requiring Defendants to pay restitution to Plaintiffs.

114.    Prior to trebling, Plaintiff suffered economic injuries as a direct and proximate result of violating TEX. BUS. COMM. CODE, §17.41, *et seq*., in an amount to be proven at trial but that is no less than $850,000.

**COUNT V**

**VIOLATION OF BUSINESS AND PROFESSION CODE § 17200 & 17204**

115.    Plaintiffs repeat and re-allege all paragraphs above as if set forth fully herein.

116.    The Martinez Firm has committed acts of unfair competition as defined by BUS. & PROF. CODE § 17200 and the issuance of a §17204 injunction is needed to halt the Martinez Firm Mastiff from defrauding the public. This UCL claim is brought to end the Martinez Firm's practice of engaging in fraudulent commercial transactions in this state and to stop its business practice of violating TEX. DISCIPLINARY R. PROF. CONDUCT 1.03, 1.04, 1.08, and 1.14 to the injury of California residents. Notably, Defendants continue to represent at least one California resident in the FDIC Litigation demonstrating that Defendants unlawful business practices must be enjoined.

117.    As provided for herein Plaintiffs have suffered actual monetary losses as a result of Defendants fraud and violations of TEX. DISCIPLINARY R. PROF. CONDUCT 1.03, 1.04, 1.08, and 1.14.

118.    This Court should preliminarily and permanently enjoin the Martinez Firm from charging unconscionable fees and engaging in violations of TEX. DISCIPLINARY R. PROF. CONDUCT 1.03, 1.04, 1.08, and 1.14 that could injure California residents.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

   a.    For compensatory damages in an amount to be proven at trial but no less than
         $850,000;

28

**COMPLAINT**

b.  An award of treble damages as provided by 18 U.S.C. §1964(c);

c.  An award of all statutory, compensatory, and all exemplary damages allowed by law in favor of Plaintiff and against all Defendants, jointly and severally;

d.  An award of prejudgment interest as allowed by CALIFORNIA CIVIL CODE §3287;

e.  An award of post judgment interest as allowed by CALIFORNIA CIVIL CODE §685.010;

f.  Costs incurred and reasonable attorneys fees pursuant to CALIFORNIA CIVIL CODE §§1021.5, 1717, 1788.30(b), 1788.30(c), BUS. & PROF. CODE §17200, *et seq.*; TEX. BUS. COMM. CODE, §17.50(d) and 18 U.S.C. §1964(c);

g.  A constructive trust over all of Defendants assets in an amount to be proven at trial but no less than $850,000 as provided for in CAL. CIV. CODE §§ 2223 and 2224 and explained in *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 236-238;

h.  And for any and all other equitable relief the Court may deem just and proper.

Dated: April 29, 2015

Respectfully submitted,

Christopher W. Hellmich (SBN 224169)
**Hellmich Law Group, P.C.**
2967 Michelson Dr.
Bldg. G, Suite #491
Irvine, CA 92612
Phone: (949) 287-5708
Fax: (714) 974-7733
Mobile: (202) 320-5404
Email: chellmich@hellmichlaw.com

*Attorney for Plaintiffs*

**COMPLAINT**